J-S84016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.C.B., A MINOR  APPEAL OF T.L.B., MOTHER | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | No. 2871 EDA 2018 |

Appeal from the Order Entered August 16, 2018
In the Court of Common Pleas of Northampton County
Domestic Relations at No(s):  C-0048-CV-2017-0120

BEFORE:  BENDER, P.J.E., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED FEBRUARY 13, 2019**

Appellant, T.L.B. a/k/a T.L.C. ("Mother"), appeals from the order entered on August 16, 2018, in the Court of Common Pleas of Northampton County, terminating involuntarily her parental rights to her son, C.C.B. ("Child"), born in October of 2015.[1]  Upon review, we affirm.

In the subject order, the orphans' court set forth 69 factual findings.[2] Because the testimonial evidence supports the court's findings, we adopt them herein.  ***See*** Order, 8/16/18, at 5-11.

---

[1] By separate order entered on the same date, the orphans' court involuntarily terminated the parental rights of Child's putative father, M.A.E. ("Father"). Father did not file a notice of appeal.

[2] Factual findings 39-48 and 64-67 relate to Father only.

We summarize the relevant facts, as follows. On June 30, 2016, the juvenile court placed Child, then nearly nine months old, in emergency shelter care with the Northampton County Department of Children, Youth, and Families ("CYF") due to Mother's and Father's homelessness. Order, 8/16/18, at 5, ¶¶ 5-6. The court adjudicated Child dependent on October 5, 2016, and, at the same time, returned Child to Mother's physical custody at Third Street Alliance for Women and Children, a homeless shelter. *Id.* at 5, ¶¶ 6, 8. Approximately two weeks later, the shelter evicted Mother for failing to comply with its rules. Consequently, the court placed Child back in foster care, where he remained during the pendency of this case. *Id.* at 6, ¶ 15.

Thereafter, Mother struggled with drug addiction, mental health, and employment and housing instability. Mother was required to satisfy the following family service plan ("FSP") objectives: participate in a drug and alcohol and a mental health evaluation and follow all recommendations; submit to random drug screens; maintain stable employment and housing; and participate in supervised visitation with Child. *Id.* at 6, ¶ 10.

By December 5, 2017, when CYF filed the petition to terminate Mother's parental rights involuntarily, Mother had failed to satisfy all of her FSP objectives except for participating consistently in supervised visitation since May of 2017.

A hearing on CYF's petition occurred on May 8, 2018.[3] CYF presented the testimony of its caseworkers, Angela Ball and Allyson Barr, and the director of the Youth Advocacy Program, Cheryl Hopkins. Mother testified on her own behalf.

By order dated August 15, 2018, and entered on August 16, 2018, the court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal. On September 21, 2018, the orphans' court filed a statement pursuant to Pa.R.A.P. 1925(a), wherein it referred this Court to the subject order for its rationale in terminating Mother's parental rights.

On appeal, Mother presents the following questions:

1. Did the [orphans'] court err in finding that Mother had failed to fulfill her parental duties, or to work toward fulfillment of her parental duties through engagement with and satisfaction of the goals of her permanency plan for a period in excess of six (6) months?

2. Did the [orphans'] [c]ourt err in finding that Mother had been rendered incapable of parenting and had refused to parent due to her active substance use and her consequential failure to satisfy the requirements of her permanency plan, leaving the child without the benefit of parental care and has failed to provide for his physical and mental well-being?

3. Did the [orphans'] [c]ourt err in finding that Mother was not prepared to assume her parental role?

---

[3] Child was represented during the hearing by legal counsel as well as by a guardian *ad litem* ("GAL").

4.     Did the [orphans'] [c]ourt err in finding that severing the parental-child relationship would not destroy an existing, necessary and beneficial relationship?

5.     Did the [orphans'] [c]ourt err in finding that termination of Mother's parental rights would best serve the needs and welfare of the child?

6.     Did the [orphans'] [c]ourt err in finding that termination of Mother's parental rights is in the [c]hild's best interest?

Mother's brief at 7-8.

Our standard of review in this appeal is abuse of discretion, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests

of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, we conclude that the certified record supports the order pursuant to Section 2511(a)(1) and (b), which provides as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); ***see also In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court

as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[4]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

It is well-established that "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 91 (Pa. 1998) (emphasis in original) (citation omitted). In addition,

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

---

[4] Based on this disposition, to the extent Mother argues in her second and third issues that the orphans' court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(2), (5), and/or (8), we need not review them.

***In re N.M.B.***, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

***Id.*** (citations omitted).

We have stated that the court must next consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). ***In re Z.S.W.***, ***supra*** (quoting ***In re Adoption of Charles E.D.M.***, ***supra*** at 92).

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.

The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Mother asserts that her conduct does not warrant termination under Section 2511(a)(1) because she did not exhibit a settled purpose of abandoning Child or relinquishing her parental rights. Specifically, she asserts that her supervised visits with Child went well and that a bond exists between them. In addition, Mother asserts that she complied with each of the services requested of her, namely, mental health, drug and alcohol evaluations, and that she cooperated with the Youth Advocate Program. We disagree.

The orphans' court found clear and convincing evidence that Mother failed to perform her parental duties "since the inception of the dependency." Order, 8/16/18, at 13. As such, the court did not set forth any finding with respect to Mother's intent to relinquish her parental rights. *See In re Adoption of Charles E.D.M.*, *supra* ("[P]arental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties."). The court found as follows, which the testimonial evidence supports.

> While Mother visits with the child and is bonded, she has been inconsistent at best with the remaining requirements of her permanency plan, and[,] particularly, she has failed to stay free from [illicit] substances, she has failed to complete drug and alcohol treatment, and she has failed to routinely submit to substance abuse testing.

Order, 8/16/18, at 13-14.

Angela Ball, the CYF case supervisor for this family from approximately August of 2016, to August of 2017, testified that, beginning in November of 2016, after Mother was evicted from the homeless shelter and Child was returned to foster care, Mother did not maintain consistent contact with CYF. N.T., 5/8/18, at 36, 47. Finally, in March of 2017, Mother contacted Ms. Ball and told her "she was held in a garage against her will by [Father]. Just recently was she able to contact me and wanted to meet with me." *Id.* at 37. Ms. Ball and Mother met in April of 2017, along with people from "Truth Home," a facility where she was residing and from where she received services. *Id.* However, Ms. Ball testified that Mother left "Truth Home" one or two weeks after their meeting, and Mother advised that she was then staying with friends. *Id.* at 39. Mother did not maintain stable housing during the year that Ms. Ball was the case supervisor. *Id.* at 55-56.

Ms. Ball testified that Mother did not consistently attend supervised visitation with Child until May of 2017, which was biweekly for one hour. *Id.* at 43. Mother did not consistently participate in mental health services during the year Ms. Ball was involved in the case. *Id.* at 39-40. Further, Mother participated in a drug and alcohol evaluation in September of 2016, but she subsequently cancelled the recommended intake appointment for services. *Id.* at 57. Ms. Ball testified that Mother attended all but three urine drug screens from July 1, 2016, through October 27, 2016, but she only attended

one more screen at the Truth Home during her time on the case. *Id.* at 40-41, 49. Mother's drug screen on July 1, 2016, was positive for alcohol and marijuana. *Id.* at 50. Ms. Ball testified that Mother was incarcerated for possession of marijuana for an unspecified time-period during the year she was involved in the case. *Id.* at 51.

In August of 2017, Allyson Barr became the CYF caseworker for this family, and she remained so at the time of the subject proceeding. Mother advised her in August of 2017 that she was residing with her friend, J. *Id.* at 61-62. Ms. Barr testified that Mother "moved to different locations, but she would return back to [J.]'s." *Id.* at 62.

Ms. Barr testified that she referred Mother to a domestic violence shelter program named Turning Point, following an incident in the CYF parking lot in August of 2017, where Mother "was assaulted and punched in the face." *Id.* at 63. Mother identified the father of another child, who is not a subject of this appeal, as the assailant.[5] *Id.* at 64.

---

[5] This case includes a history of domestic violence by Father against Mother. In August of 2016, Mother filed a Protection from Abuse ("PFA") petition against Father, wherein she alleged that he bit, punched, and choked her. *See* Order, 8/16/18, at 5, n. 3. Further, she alleged that she "had to walk with my head down because he would think I was looking at other men," *inter alia*. *Id.*

With respect to Mother's assault in the parking lot, the testimonial evidence reveals that Mother misidentified or would not reveal the assailant. N.T., 5/8/18, at 72-73, 97. Ms. Barr testified that Mother told the police that Father assaulted her, in contrast to what she told CYF. *Id.* at 73.

Ms. Barr testified that she referred Mother to Turning Point twice, and, after the second referral, Mother contacted Turning Point, which offered to relocate her to the Reading area of Pennsylvania. *Id.* However, before relocating, Mother became incarcerated, from March 6, 2018, to March 20, 2018, for failure to pay child support. *Id.* at 65, 82. Upon her release from prison, Mother returned to J.'s residence. *Id.* Ms. Barr testified that, on the day of the subject proceeding, Mother informed her she had moved on the previous day into a room that she was renting with Father. *Id.* at 65-66.

Ms. Barr testified that, after Mother's release from her two-week incarceration in March of 2018, she met her at the CYF office, during which Mother "was looking to reconnect herself into some services, and she did admit to me she had been using K2[6] for the past three years." *Id.* at 69. Ms. Barr testified that Mother stated, "she was no longer using and that she completely withdrew from it while she was incarcerated, and she said there were . . . no concerns of her using." *Id.* at 69-70. Ms. Barr testified that Mother denied active drug use during her two drug and alcohol evaluations in 2016, as well as another drug evaluation in 2017. *Id.* at 97.

Ms. Barr testified that, when she assumed the case in August of 2017, Mother "would attend some urine screens. So there were a few negatives, but she would no-show a lot of her screens." *Id.* at 70. She testified that, in

_____

[6] K2 is a synthetic cannabinoid.

- 11 -

December of 2017, CYF "started using [A]verhealth [for the drug screens], [and] [Mother] did not show up to any of her screens." *Id.* Mother's last urine screen was on September 21, 2017, and Ms. Barr testified, without explanation, that it was "abnormal."[7] *Id.* at 71.

Mother testified on cross-examination by the GAL, as follows:

Q. So for the entire time that the [c]ounty's been involved with this case for three years and your child – almost three years and your child [has] been in foster care, you've been lying about your drug use; is that correct?

A. I have lied, yes.

*Id.* at 125. In addition, Mother testified that she lied to Ms. Ball in 2017 about Father having held her hostage in a garage because she was "using crack cocaine." *Id.* at 123. She continued on cross-examination:

Q. How did you get the money for crack . . . ?

A. Rob Peter to pay Paul.

Q. That's not an answer.

How did you get the money?

---

[7] In addition, Cheryl Hopkins, the director of the Youth Advocate Program, testified that, on June 15, 2017, she opened a case for Mother to assist her in stabilizing her housing, employment, mental health, and to transport her to urine screens and other appointments. Ms. Hopkins' testimony was consistent with that of the other CYF witnesses regarding Mother's lack of progress in these areas. *See* N.T., 5/8/18, at 9-16, 26-27. She also testified that Mother "has been inconsistent really [in] tak[ing] advantage of the services that are available [through the Youth Advocate Program] as far as transportation to get to appointments." N.T., 5/8/18, at 16. Ms. Hopkins testified with respect to whether Mother is ready to be reunified with Child, that, "her inconsistency of having stable housing and stable employment is a definite deterrent to having her son return at this point." *Id.*

A. I sold my belongings. I sold myself. I stole.

*Id.* at 123-124. Mother testified on cross-examination by CYF's counsel that she first became "clean" from drugs "[t]wo and a half months ago." *Id.* at 136. She testified:

Q. So you've been using up until two and a half months ago?

A. Off and on.

Q. All the time?

A. Not crack. I was using synthetic marijuana.

*Id.*

Mother testified that she told the truth in her allegations against Father in her August of 2016 PFA petition. *Id.* at 121. Nevertheless, she testified that she is now living with Father. *Id.* at 122. Mother testified on cross-examination by the GAL:

Q. What have you done to solve these problems that led to you to get this PFA?

A. Talked about it, have counseled each other about it, have prayed to the Lord about it. We have sat and talked. We have a plan. We are working on writing our goals down, writing our plans down. Our communication is a key factor right here, right now. We have communication.

*Id.*

Mother testified that, within the last week, she became employed "at the residence . . . which is my new residence. I'm a superintendent of the building. It is a rooming home in which I manage, so I would clean, renovate,

do things like that. So I do have a job with that." *Id.* at 110. However, Mother testified that she only moved to the new residence "yesterday." *Id.* at 127. She testified on cross-examination by the GAL that the longest she has lived in one place over the last two years is "less than one month." *Id.* With respect to how long she has held a job, from start to finish, in the last two years, Mother testified on cross-examination by CYF's counsel, "Less than three months." *Id.* at 136.

Finally, Mother acknowledged her mental instability at the time of her eviction from her home in June of 2016. *Id.* at 104. She acknowledged receiving mental health treatment but only inconsistently after Child's adjudication. *Id.* at 105. On cross-examination by CYF's counsel, Mother testified:

> Q. And you moved around between various mental health providers; correct?
>
> A. Two, yes.
>
> . . .
>
> Q. You didn't just move twice. You were with HAO [Hispanic American Organization], you were with Omni [Health Services], back to HAO. You . . . were without treatment for periods of time. Is that accurate?
>
> A. Yes.
>
> Q. And that was your choice?
>
> A. Part – partially. Partially my choice. Up until the most recent one when my doctor passed away. . . .

*Id.* at 133-134. Mother explained that she reinitiated services from HAO only three weeks prior to the termination hearing. *Id.* at 105. Prior to returning to HAO, Mother testified that she treated with Omni Health Services for "[l]ess than a year" because her therapist died. *Id.* at 106.

Based on the foregoing, we conclude that the court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(1). Mother has refused or failed to perform her parental duties to Child far in excess of June 5, 2017, or six months immediately preceding the filing of the subject petition. Mother remained out of contact with CYF from November of 2016, after Child returned to foster care, until March of 2017. Thereafter, Mother's drug addiction, mental health, housing, and employment instability continued. Mother's alleged efforts in these areas close to the time of the termination hearing are insufficient in light of the totality of the circumstances of this case.

With respect to Section 2511(b), Mother asserts that a bond exists between Child and her, and that no record evidence exists regarding the effect on Child of severing that bond. We disagree with Mother's characterization of the existence of a bond in this case.

In analyzing the decree pursuant to Section 2511(b), the following case law is relevant.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

- 15 -

> *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.
>
> *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the orphans' court found that Child "has a connection with Mother," but it "is limited to the contact they have at supervised visitations. .

. .” Order, 8/16/18, at 14, ¶ 6. We agree. Indeed, our review of the record does not reveal the existence of a parent-child bond between Mother and Child.

The court found, and Ms. Barr's testimony supports, that Mother had weekly one hour supervised visits with Child at the time of the subject proceeding, which "has not been expanded by [CYF] [during Child's placement] due to Mother's failure to satisfactorily comply with the requirements of the permanency plan." *Id.* at 14, ¶ 6. Mother had consistently attended the visits for one year at the time of the hearing.

The only evidence regarding Mother's interaction with Child during visits is from Ms. Hopkins, the director of the Youth Advocate Program, who observed six to eight of them. N.T., 5/8/18, at 17. The last one she observed was in either late December of 2017, or early January of 2018. *Id.* at 18. Ms. Hopkins testified that the visits were positive; that Mother "displayed excellent parenting techniques;" and that she observed "a strong bond" between Mother and Child. *Id.* at 17, 20. However, despite Ms. Hopkins' testimony that the visits were positive, she testified that she never recommended that the visits be unsupervised because Mother "never had a stable place to . . . bring her son to have a visit." *Id.* at 17.

Upon thorough review, there is no evidence in the certified record that a parent-child bond exists between Mother and Child based on weekly one-hour supervised visits that had occurred for one year, when Child was between

nineteen to 31 months old. However, Ms. Barr, who visits Child monthly in the foster home, where he has resided since he was nine months old, testified that Child "refers to his foster parents as mom and dad. He looks for them to meet his daily needs and to comfort him." *Id.* at 74. Further, Ms. Barr testified that she "would have concerns about ending [Child's] relationship with his foster parents. . . ." *Id.* at 75. In addition, she testified that Child's foster parents are "a potential [permanent] resource." *Id.* at 74.

Thus, we discern no abuse of discretion by the orphans' court in finding that there is "a connection" between Mother and Child, but it is limited to the supervised visits, and that a bond exists between foster parents and Child. In addition, the evidence of record supports the court's finding that CYF "has proven . . . by clear and convincing evidence, not only that Mother is in no way prepared to assume her parental role, but . . . that severing the parent-child relationship would not destroy an existing, necessary, and beneficial relationship." Order, 8/16/18, at 14. As such, the totality of the record evidence demonstrates that terminating Mother's parental rights serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). *See In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted) ("[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and

fulfillment of [the child's] potential in a permanent, healthy, safe environment."). Accordingly, we affirm the order.[8]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/19

---

[8] The GAL has filed a brief on appeal in support of the subject order.